Stephen KOMNINOS, an infant, by his Guardian Ad Litem, Thomas Komninos; Thomas Komninos; Winifred Komninos, Individually, Appellants,

v.

### UPPER SADDLE RIVER BOARD OF EDUCATION, Appellee.

No. 93–5586.

United States Court of Appeals, Third Circuit.

Argued Dec. 7, 1993.

Decided Jan. 12, 1994.

Charles Rodgers (argued), Lawrence Z. Farber, Breslin and Breslin, P.A., Hackensack, NJ, for appellants.

Frederic M. Shulman (argued), Ralph J. Padovano, Antimo A. Del Vecchio, Beattie Padovano, Montvale, NJ, for appellee.

Before: BECKER, NYGAARD, and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

In this appeal, we determine that a district court may entertain a motion for a preliminary injunction before administrative remedies have been exhausted if a School Board's interim placement decision under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1484a, will cause irreparable harm to a child. Because the district court erred in concluding that it lacked jurisdiction, before making a complete inquiry as to the existence of exceptions to the exhaustion doctrine, we will remand for further proceedings.

Stephen Komninos is a severely retarded eight-year-old boy who has cerebral palsy as well as associated communicative and behavioral disorders. Pursuant to an individual education plan and funding by the defendant Upper Saddle River Board of Education, Stephen was placed as a day student at the Norman Bleshman Regional Day School in Paramus, New Jersey.

In April 1993, Stephen's parents, plaintiffs in this suit, requested that he be placed in a residential facility as a means of improving his condition and skills. After the Board refused to comply with the wishes of the parents, they sought administrative relief pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1415(e), formerly known as the Education of the Handicapped Act.

Unwilling to await the completion of the administrative proceedings, the parents moved Stephen in May 1993 to Heartspring, a residential school located in Wichita, Kansas. The Board initially refused to fund Stephen's care at Heartspring, but then agreed to pay for the summer session ending on August 7, 1993, without prejudice, pending the completion of the administrative proceedings.

In July 1993, plaintiffs moved for emergency relief before the ALJ assigned to the case. They asked for an administrative order directing the Board to pay Stephen's expenses at Heartspring for the new school year beginning August 23, 1993 during the pendency of the administrative proceedings. Noting that material facts were in dispute and that plaintiffs had failed to demonstrate "irreparability of harm or irretrievable interruption of [the] educational program," the ALJ denied the motion. He characterized the order as "final pursuant to 20 U.S.C. § 1415(e)."

The parents filed a second motion in September 1993 asserting that Stephen would be forced to change schools because their funds would be exhausted before the completion of the administrative proceedings. The ALJ found that plaintiffs' claim was essentially "dollar driven," and therefore, not irreparable. The ALJ concluded that Stephen's danger to himself was no "more predictably acute everywhere except at Heartspring," and on September 21, 1993, denied the renewed motion, again certifying that the order was final.

In the interim, on September 3, 1993, plaintiffs submitted a verified complaint to the district court "by way of appeal" from the ruling of the ALJ and asked for a preliminary injunction.[1] The parents requested that the Board be directed to place Stephen and fund his schooling at Heartspring or

---

1. Although plaintiffs have styled the complaint in part as an appeal from the ALJ's order, we do not consider that a basis for district court jurisdiction. Section 1415(e) does not grant a court authority to review an ALJ's decision before the administrative process has been completed. From the standpoint of federal jurisdiction, therefore, the ALJ's order is interlocutory and his characterization of his order as "final" is irrelevant.

another similar residential facility while the administrative hearings were proceeding.

The complaint asserted that, absent the socialization and specialized care offered at Heartspring or a similar institution, Stephen would be "physically, permanently and irreparably educationally harmed." Plaintiffs alleged that because the Board had refused to provide interim funds, the child was "suffering immediate, substantial and irreparable harm."

Before the Board filed responsive pleadings, the district court dismissed the complaint. The order stated that 20 U.S.C. §§ 1400–1484a vests a district court "with jurisdiction only when a plaintiff has first followed the procedures set forth in the Act and exhausted the administrative remedies under the Act." Accordingly, "plaintiffs not having yet exhausted the procedures required by the Act," the district court dismissed the complaint "for lack of jurisdiction."

## I.

The Individuals with Disabilities Education Act provides for a "free appropriate public education" for all handicapped children, 20 U.S.C. § 1412, and establishes an elaborate procedural mechanism to protect the rights of those individuals. One procedural safeguard is the right to a due process hearing before an administrative official.[2] Parties aggrieved by the findings and decision made in the administrative proceedings provided by the Act have the right to bring a civil action in either federal or state court. 20 U.S.C. § 1415(e)(2). In such an action, the court reviews the records of the administrative proceedings, hears additional evidence at the request of a party, and grants such relief as may be appropriate. *Id.*

■ Section 1415(e) thus grants subject matter jurisdiction to the district courts. However, it is clear from the language of the Act that Congress intended plaintiffs to complete the administrative process before resorting to federal court. In *Smith v. Robin-*

son, 468 U.S. 992, 1011–12, 104 S.Ct. 3457, 3468–69, 82 L.Ed.2d 746 (1984), the Supreme Court noted that allowing an equal protection claim without requiring exhaustion under the predecessor statute, would not only "render superfluous most of the detailed procedural protections outlined in the statute, but, more important, it would also run counter to Congress' view that the needs of handicapped children are best accommodated by having the parents and the local education agency work together to formulate an individualized plan for each handicapped child's education."

■ Even though the policy of requiring exhaustion of remedies in the Disabilities Education Act is a strong one, some exceptions have been recognized. In *Honig v. Doe*, 484 U.S. 305, 327, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988), a case brought under an earlier version of the Act, the Court stated that "parents may bypass the administrative process where exhaustion would be futile or inadequate." In like vein, an exception exists where the issue presented is purely a legal question, *Lester H. by Octavia P. v. Gilhool*, 916 F.2d 865, 869–70 (3d Cir.1990), or where the administrative agency cannot grant relief (e.g., hearing officer lacks authority to provide a remedy). *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1303–04 (9th Cir.1992).

■ At least one Court of Appeals has recognized another exception—when exhaustion would work "severe or irreparable harm" upon a litigant. *Christopher W. v. Portsmouth Sch. Comm.*, 877 F.2d 1089, 1097 (1st Cir.1989); *see also Ezratty v. Puerto Rico*, 648 F.2d 770, 774 (1st Cir.1981). This last exception finds support in the legislative history of the Disabilities Education Act which states that exhaustion would not be necessary when "an emergency situation exists (e.g., the failure to take immediate action will adversely affect a child's mental or physical health)." H.R.Rep. No. 296, 99th Cong., 1st Sess. 7 (1985). In accordance with the position taken by the Court of Appeals for the First Circuit and legislative history, we also adopt an emergency situation exception

---

**2.** The procedures are set out in 20 U.S.C. § 1415(b). See the discussions in *Honig v. Doe*, 484 U.S. 305, 310–12, 108 S.Ct. 592, 597–98, 98

L.Ed.2d 686 (1988); *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 180–83, 102 S.Ct. 3034, 3037–39, 73 L.Ed.2d 690 (1982).

to the exhaustion requirement of the Disabilities Education Act. Having recognized such a category, however, we caution that it is to be sparingly invoked.

The emergency situation exception differs from the others because of its dependence on the facts of a case and the interference created with the administrative proceedings in progress. The advantages of awaiting completion of the administrative hearings are particularly weighty in Disabilities Education Act cases. That process offers an opportunity for state and local agencies to exercise discretion and expertise in fields in which they have substantial experience. These proceedings thus carry out congressional intent and provide a means to develop a complete factual record. *Smith v. Robinson,* 468 U.S. at 1011, 104 S.Ct. at 3468 (Congress made express efforts to place primary responsibility for fulfilling the needs of handicapped children on local and state education agencies). The administrative hearings generally will produce facts and opinions relevant to the very same issues presented to the court by plaintiffs.

█ Disruption and interference with the state proceedings can have serious adverse effects. For instance, the duplication of effort in evaluating the same areas of controversy is a substantial detriment to consistency and procedural efficiency. Factors such as these counsel district courts to avoid premature intervention. The vitality of the carefully conceived administrative procedure, providing as it does for active, intense participation by parents, educational authorities, and medical personnel, must be preserved by the court's insistence upon proof of irreparable injury before allowing a party to bypass the exhaustion requirement.

Thus, mere allegations by plaintiffs of irreversible harm will not be enough to excuse the completion of administrative proceedings. Plaintiffs must provide a sufficient preliminary showing that the child will suffer serious and irreversible mental or physical damage (e.g., irremediable intellectual regression) before the administrative process may be circumvented.

█ In order to meet that threshold, plaintiffs must provide affidavits from competent professionals along with other hard evidence that the child faces irreversible damage if the relief is not granted. If plaintiffs meet that burden but the defendant in connection with a 12b(1) motion to dismiss presents convincing evidence that such harm will not occur, the court should not proceed, but rather must require plaintiffs to exhaust their administrative remedies. We leave the means to determine whether the threshold requirements have been met to the discretion of the district court. *Tanzymore v. Bethlehem Steel Corp.,* 457 F.2d 1320, 1323 (3rd Cir.1972); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (1990).

If plaintiffs satisfy the preliminary inquiry, the district court should then proceed with the traditional preliminary injunction procedures. Nothing in the Disabilities Education Act suggests that once action by the district court is appropriate, the standards for granting relief should be different than in other typical federal lawsuits. *See* H.R.Rep. No. 296, 99th Cong., 1st Sess. 7 (1985) ("with respect to the filing of a civil action, nothing in the bill or the report should be construed to modify traditional standards used by the courts for determining when parents and guardians may initiate law suits and the circumstances under which it is appropriate to grant a preliminary injunction.").

## II.

We turn then to the facts at hand. The Komninos family has not yet exhausted its administrative remedies. The due process hearings on the child's proper permanent placement are continuing, but the parents asked the district court to direct that the Board provide immediate funding, a step it had refused to take in the due process hearings. Exhibits to the verified complaint in the district court include reports by a neuropsychiatrist, by the Director of Psychological Services at Heartspring, by Stephen's parents and by others who have observed Stephen's behavior. These reports describe Stephen's continued, unpredictable, aggressive and assaultive actions, his favorable

progress in toilet training at Heartspring, and his very limited attention span in classroom efforts. Dr. Williams, the neuropsychiatrist, opined that a twenty-four-hour residential program is necessary, that Stephen is a danger to himself and to others around him, and that moving him from Heartspring to a non-residential school would cause the child to "suffer serious regression."

Because of the procedural posture of the case, however, the district court record does not contain any materials or reports obtained by the Board. At oral argument in this Court, however, we were advised that in the continuing hearings before the ALJ, the Board had produced evidence challenging some of the plaintiffs' contentions about Stephen's possible regression. The fact that the pending administrative hearings are delving into many of the same factual issues presented to the district court graphically illustrates the disadvantages of concurrent activity in the two forums.

■ We do not presume to issue a definitive ruling in the absence of a more complete record, but we doubt that "regression" per se constitutes such irreparable harm as to justify an exception to the exhaustion requirement. It is our understanding that, in general, the skills lost in regression may be recouped, but that the disabled take longer than the non-handicapped to regain their previous achievements. *See generally Johnson v. Independent Sch. Dist. No. 4 of Bixby Tulsa County, Okla.,* 921 F.2d 1022, 1027–28 (10th Cir.1990); *Cordrey v. Euckert,* 917 F.2d 1460, 1470–74 (6th Cir.1990); *Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 183–84 (3d Cir.1988); *Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.,* 790 F.2d 1153, 1158–59 (5th Cir.1986); *Battle v. Pennsylvania,* 629 F.2d 269, 275 (3d Cir.1980).

■ The decisional law discussing the regression problem in reviewing final placement decisions is helpful, but the cited cases differ from the one here where the critical question is whether there is such immediacy of harm as to preclude delay until the administrative process is completed. When awaiting the outcome of agency proceedings does not jeopardize the child's future progress to any substantial degree, courts should be wary of foregoing the benefits to be derived from a thorough development of the issues in the administrative proceeding. If a court does insist on exhaustion of the administrative process and ultimately the Board is found to have erred in failing to provide a proper placement, a remedy is available. The delay in obtaining the expected benefit may be redressed by compensable extensions of eligibility for educational aid. *Lester H. by Octavia P.,* 916 F.2d at 872–73; *see also Pihl v. Massachusetts Dep't of Educ.,* 9 F.3d 184, 188–90 (1st Cir.1993); *Miener by and through Miener v. Missouri,* 800 F.2d 749, 753–54 (8th Cir.1986).

A showing at the time the suit is filed in the district court, however, that the regression will be irreversible would demonstrate irreparable harm and would relieve plaintiffs from the obligation to finish the administrative process before seeking judicial relief.

One other point deserves mention. Sometimes self-help rather than court action may be utilized. Parents who have adequate funds are given the option of placing their child in a facility of their choosing with the risk that they will not be reimbursed if they fail to succeed in the litigation over the child's permanent placement. *See School Comm. of Burlington v. Department of Educ. of Mass.,* 471 U.S. 359, 373–74, 105 S.Ct. 1996, 2004–05, 85 L.Ed.2d 385 (1985). The parents in this case, however, do not appear to have adequate funds to meet the costs for Stephen's interim placement at Heartspring.

After the appeal was taken to this Court, the parents filed an affidavit averring that they were personally expending $9,650 per month for Stephen's care at Heartspring. They stated that they were refinancing the mortgage on their home to continue the payments, but that they would be unable to do so after December 1993. The parents' financial condition was not brought to the attention of the district court, but is a matter that might make the reimbursement alternative unrealistic. As such, it may be a factor that the district court will wish to consider on remand.

Because the district court was under the misapprehension that it lacked authority to exempt parties from exhaustion of remedies in proper circumstances in Disabilities Education Act cases, we must return this case for further consideration. We do so with full understanding of the difficulty with litigation of this nature. We recognize that the intense and commendable concern of the parents for the welfare of their child, as well as society's concern for protecting these children, must be weighed against the duty of school boards to carefully allocate their limited resources in fairness to all, as best as can be done. We intimate no views on the appropriate disposition of the case by the district court.

The order of the district court will be vacated and the case will be remanded for further proceedings consistent with this Opinion.

The parties will bear their own costs.